Filed 5/20/16  In re Levi W. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re LEVI W., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>L.S.,<br><br>  Defendant and Appellant. | A146742<br><br>(Contra Costa County Super. Ct. No. J1300579) |

This timely appeal by L.S. is from the order of September 11, 2015 by which the Contra Costa Juvenile Court terminated her parental rights as to minor Levi W.[1]  On that date, the court was considering the report of the Contra Costa County Children and Family Services Bureau (Bureau) concerning appellant's four sons, of whom Levi is the

---

[1] In her notice L.S. appeals from the "findings and orders of the court . . . [on] April 1, 2015 & September 11, 2015, terminating parental rights and setting [*sic*: selecting] adoption as the permanent plan."  Only the latter order is appealable. (*In re Janee J*. (1999) 74 Cal.App.4th 198, 206.)  The April 1, 2015 order scheduled the September 11 hearing for selection of a permanent plan in accordance with Welfare and Institutions Code section 366.26.  That order is not appealable because appellant did not timely seek review by a petition for a extraordinary writ.  (Welf. & Inst. Code, § 366.26, subd. (*l*).)  In any event, appellant's sole argument has nothing to do with the April order.

1

oldest. Levi and his brothers had been detained from appellant's custody in May 2013. The court had conducted a 18-month review in November 2014.

The Bureau caseworker noted that teenager[2] Levi, who "exhibits great maturity," "has the probability for adoption because his current caregiver is an identified prospective adoptive parent. Levi reports his desire to be adopted by his caregiver as well."[3] The caseworker summarized the Bureau's recommendation to terminate parental rights only as to Levi, not his brothers:

"Levi . . . . feels at home in his current home, has a strong bond with his prospective adoptive mother. He has repeatedly expressed a desire to stay in this house as an adopted child. At this time in Levi's life, he is choosing permanency over the parental/child bond that he has with his biological parents. The undersigned as well as the foster family agency social worker have spoken many times to Levi about this matter and his desires have never wavered. He is clear that he would like to continue to have phone calls with his parents, occasional visits, but he feels that he is home.

"The issue before the court today concerns the most appropriate permanent plan for the child. The child has no significant parent/child relationship which would outweigh the benefits of legal permanency for the child. Welfare and Institutions Code [section] 366.26 states that adoption should be the permanent plan if there is clear and convincing evidence that the child will be adopted. The child is an adoptable child, placed in an approved adoptive home. Therefore, Children and Family Services respectfully recommends that the Court terminate the parental rights of the mother . . . and make adoption the permanent plan for the child."

---

[2] For reasons of privacy, Levi's precise age cannot be used here. His age is significant because he is given the statutory right to object to termination of parental rights. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(ii).)

[3] Two of Levi's brothers "have the probability for adoption or legal guardianship," which their caregiver was "considering . . . at this time," while the third brother "has the probability for either longterm foster care or legal guardianship with his current caregiver."

The hearing on September 11 was brief. Appellant was present, and was represented by counsel and by a guardian ad litem. After appearances and the nature of the proceeding were stated for the record, counsel for the Bureau addressed the court:

". . . Your Honor. . . I believe there's a guardian ad litem issue that we need to address before we ask the Court to adopt the recommendations.

"MR. STERN [Counsel for appellant]: That's correct. I appreciate my [*sic*] guardian ad litem's efforts and work in this case. My client has come a long way over the length of this case and in herself and her own recovery. And it's my opinion that she fully understands the nature of these cases and is able to engage with me and discuss these cases at length and make decisions on her own behalf. And although I would like to have Ms. Smith [the guardian ad litem] always as a partner in a case, she's no longer needed in this matter."

After a brief colloquy with appellant and the guardian ad litem, the court relieved the guardian ad litem. Counsel for the Bureau and Levi then submitted on the basis of the caseworker's reports, the latter reaffirming that "Levi is very much looking forward to being adopted by this family. . . . [¶] . . . He just feels like it's home, and this is his forever family."

After counsel for the father submitted, Mr. Stern then spoke for appellant: "Well, this is a difficult decision for mother, but she understands that Levi truly does want to be adopted by this family and is willing to exceed [*sic*: accede] to his desires and wishes in this, and only wants the best for him and hopes that going forward she can still have a relationship, some contact with Levi.

"She is concerned that Levi remain in contact with his siblings, which is a separate issue, and she would encourage Levi to have as much contact as possible with the siblings, who are still under the jurisdiction of this court. And my client certainly would cooperate with all sibling contact. And she's doing this because she feels this is best for Levi at this stage."

The court characterized this as a "very mature decision." Finding "by clear and convincing evidence that it is likely that this child would be adopted. I therefore permanently terminate the parental rights of [appellant], mother of the child."

Appellant's sole claim of error is not directed at anything the juvenile court did, but at something it did not do. Specifically, appellant submits "the record does not contain substantial evidence to support a conclusion that Mother's purported submission, plea, and relinquishment of parental rights was a voluntary and intelligent waiver of rights done with sufficient awareness of the relevant circumstances and likely consequences." Appellant further argues that the juvenile court was "required . . . to determine whether or not Mother wanted to voluntarily waive . . . or relinquish her parental rights under Family Code section 8700."

With respect to the latter argument, Division Three of this appellate district recently described the cited statute's operation: "A parent may voluntarily relinquish a child for adoption and, when doing so, may designate the person with whom the parent intends the child to be placed. (Fam. Code, § 8700, subds. (a) & (f).) Generally, parents considering relinquishment to a public adoption agency contact the agency, which assesses the child for adoption and advises the parents of their rights. (Cal. Code Regs., tit. 22, §§ 35127.1, 35219.) There are several regulatory prerequisites to agency acceptance of a parent's relinquishment. Among them, 'the agency shall determine and document in the case record: [¶] (1) That the parent has chosen the plan of adoption for the child and freely chooses to relinquish the child. [¶] (2) That the agency is able to place the child for adoption. [¶] (3) Whether the child is subject to the provisions of the [Indian Child Welfare Act of 1978]. [¶] . . . [¶] (4) That the parent has received required services and advisement as appropriate to the category of parents as described [in the regulations]. [¶] (5) That the parent has the ability to understand the content, nature and effect of signing the relinquishment.' [Citation.] [¶] . . . [¶]

"When accepted, an effective relinquishment is accomplished 'by a written statement signed before two subscribing witnesses and acknowledged before an authorized official' of the State Department of Social Services (department), county

4

adoption agency or licensed adoption agency. (Fam. Code, § 8700, subd. (a).) The statement is made on a form provided by the department, which contains a section for the name of the agency and the signature of the acknowledging official. (Cal. Code Regs., tit. 22, § 35143.) 'At the time the relinquishment document for adoption is signed, the agency shall: [¶] (A) Request the parent to read and sign the [statement of the adoption process] pursuant to Family Code section 8702. [¶] (B) Advise the parent of the provisions of Family Code Section 8701 [(concerning the parent's right to request information on the status of the adoption)]. [¶] (C) Accept the relinquishment by signing the acknowledgment portion of the relinquishment document. [¶] (D) Give the parent a copy of the completed relinquishment document.' (*Id.,* § 35149, subd. (a)(3).)" (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1301–1302, fn. omitted.)

Here, there was no public or private adoption agency to whom the parent was willing to determine the placement of a minor. Relinquishment of parental rights is essentially a private transaction, with no judicial participation until the end: "Whether to accept a relinquishment of a child for adoption is a determination vested in the adoption agency. Relinquishment is made to an adoption agency . . . ." "The agency to which a child has been freed for adoption by relinquishment is responsible for the child's care until an order of adoption is granted" by the family court. (*In re R.T.*, *supra*, 232 Cal.App.4th 1284, 1308, 1302–1303.) Here, the responsible decisionmaker would be the juvenile court, assisted by the Bureau.

Appellant tells us "[a]lthough there is a Rule of Court and Judicial Council form concerning advisements and informed consent prior to accepting a plea to juvenile court jurisdiction (see rule 5.682(f); Judicial Council Forms, form JV-190), there are no rules of court or forms concerning advisements and pleas to termination of parental rights under Welfare and Institutions Code section 366.26. [¶] The fact that the Judicial Council has not promulgated rules of procedure or forms for advisements concerning the consequences of a submission or waiver of parental rights does not mean that the court has no constitutional obligation to ensure the waiver of parental rights is knowing and

5

voluntary.  Appellant asserts it would be anomalous to provide less protection for the more serious order terminating parental rights."

Again, our colleagues in Division Three are instructive:  "[Welfare and Institutions Code section] 361 has been held to establish different standards for relinquishment of a dependent child to a private adoption agency versus the department or a county adoption agency.  If a parent relinquishes a *dependent* child to a private adoption agency, 'the juvenile court retains its broad power to limit the parent's control over the dependent child, which includes the parent's ability to relinquish the child to a private adoption agency.'  [Citation.]  The court may invalidate a designated relinquishment to a private adoption agency if it finds the relinquishment is not in the child's best interest.  [Citation.]  That rule does not apply to public agency adoptions of dependent children.  [Citation.]  A court's power to limit parental control over a dependent child 'does not limit the ability of a parent to voluntarily relinquish his or her child to the [department or] to a county adoption agency.'  [Citation.]"  (*In re R.T.*, *supra*, 232 Cal.App.4th 1284, 1304–1305, italics added.)  Again, there is no adoption agency involved.

What appellant appears to want is to import one feature of the Family Code voluntary relinquishment procedure into an ongoing dependency.  Appellant implicitly concedes that the juvenile court had the power to make a valid termination, which is not the case if a Family Code voluntary relinquishment has been made.  (See *In re R.S.* (2009) 179 Cal.App.4th 1137, 1152 [after valid Family Code voluntary relinquishment, "the juvenile court was no longer authorized to order the involuntary termination of parental rights"].)  The Family Code voluntary relinquishment procedure and the dependency scheme overlap to the extent each can effect a permanent relocation of a child, but they otherwise run parallel to each other and serve different goals.  From its very nature, the Family Code voluntary relinquishment procedure has nothing in common with the initial dependency scheme goal of preserving the family unit.  (See *In re K.C.* (2011) 52 Cal.4th 231, 236 ["the law's first priority when dependency proceedings are commenced is to preserve family relationships, if possible."].)

6

We also believe appellant invests too much meaning to just her words to the juvenile court. At this point in the dependency, the emphasis had shifted from reunifying the family to providing stability and permanency for Levi. (See *In re K.C.*, *supra*, 52 Cal.4th 231, 236; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Appellant was in effect stating her consent to the Bureau's recommendation that the permanent plan for Levi be adoption. But appellant's approval, while helpful and important to the judicial decisionmaking calculus, was not a prerequisite. Nothing appellant said relieved the court of its duty to make the findings necessary to a termination order. Appellant does not challenge any of those findings, notably those that Levi could not be returned to her custody, and that there was clear and convincing evidence of the likelihood that he would be adopted. The record shows there was no dispute about fact or law. In fact, the Bureau's recommendation seems to have had universal assent, particularly from Levi. (See fn. 2, ante.) Appellant's counsel told the court in his opinion "she fully understands the nature of these cases and is able to engage with me and . . . make decisions on her own behalf." It is a reasonable inference from counsel's ensuing silence that he had discussed the import of the statement she made at the hearing. Finally, we note that this was not appellant's first experience of having her parental rights terminated. (See *In re E.H.* (Nov. 12, 2015, A142765) [nonpub. opn.].)

Thus, had appellant said nothing, there is no reason a valid termination order would not have been entered. We conclude that even if we recognized the judicial duty for which appellant now advocates, we discern no likelihood that its nonperformance would compel reversal. (See *In re Jesusa V.* (2004) 32 Cal.4th 588, 624.)

The order is affirmed.

_____

Richman, Acting P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

A146742; *In re Levi W.*

8